IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 22, 2000 Session

## STATE OF TENNESSEE v. BILLY KENNETH HALL

**Appeal from the Criminal Court for Knox County**
**No. 63757     Ray L. Jenkins, Judge**

_____

**No. E1999-02146-CCA-R3-CD**
**November 1, 2000**
_____

The defendant appeals his convictions for aggravated kidnapping and aggravated rape, contending that the evidence is insufficient to support his convictions, that the trial court should have granted a continuance to allow him to substitute counsel, and that his attorney was constitutionally ineffective.  We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Dale Miller, Knoxville, Tennessee (on appeal) and John W. Routh, Knoxville, Tennessee (at trial) for appellant, Billy Kenneth Hall.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Scott Green, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Billy Kenneth Hall, appeals as of right his convictions by a jury in the Knox County Criminal Court for aggravated kidnapping to facilitate the commission of a felony, a Class B felony, and two counts of aggravated rape, a Class A felony.  He was sentenced as a violent offender to consecutive sentences of twenty years for the aggravated kidnapping and twenty-five years for each count of aggravated rape for an effective seventy-year sentence in the Department of Correction.  The defendant contends that (1) the evidence is insufficient to support his convictions for aggravated kidnapping and aggravated rape, (2) the trial court should have granted a continuance and allowed him to change attorneys at the beginning of trial, and (3) he received the ineffective assistance of counsel at trial.  We affirm the trial court's judgments of conviction, holding that the evidence is sufficient and that the defendant has failed to show that he was prejudiced by his attorney's performance at trial.

The victim, a twenty-one-year-old student at the University of Tennessee (UT), testified that while working in the Admissions Office, she became good friends with a co-worker, Philip Payton. She said that on November 8, 1996, she had a late dinner with Mr. Payton, and they returned to his apartment between 11:00 and 11:45 p.m. to get her car. She said that two high school students, who were visiting the university, were sleeping in her dorm room that night and that she had arranged to stay with a sorority sister. She said that upon arriving at Mr. Payton's apartment, she called her sorority sister, who said that she did not want to be bothered that night. She said that she attempted to call others in her sorority, but no one was at home. She said that Mr. Payton offered to let her sleep on his couch. She stated that she had to be at an Admissions Office breakfast the next morning and that she asked Mr. Payton to set his alarm for 5:00 a.m.

The victim testified that the alarm clock woke her at 5:00 a.m. the next morning and that she quickly prepared to leave. She said that Mr. Payton had to get up when she left in order to lock the door behind her and that it was not possible for her to leave the apartment without Mr. Payton knowing about it. She said that she borrowed five dollars for gasoline from Mr. Payton and left his apartment between 5:00 and 5:15 a.m. She stated that she stopped at an Exxon Station down the street from Mr. Payton's apartment and prepaid the attendant five dollars at the window.

The victim testified that she began pumping the gasoline and looked up to see the defendant pointing a gun at her face. She said that she screamed and dropped the nozzle. She said that the defendant told her to remain quiet and pick up the nozzle. She said that after she replaced the nozzle in her car, the defendant asked for all of her money and jewelry. She said she told him that she did not have any money or valuable jewelry. She said that she was wearing a watch and earrings that morning. She said that she offered him the keys to her car, which the defendant took, and that he ordered her into the car. She said that she told the defendant that she did not have much gasoline, and he ordered her to finish pumping the gasoline. She said that after she finished, the defendant, who was still pointing the gun at her, told her to get in the car and to drive. She said that she was shaking and crying.

The victim testified that the defendant directed her to an alley and, with the gun still in hand, ordered her to stop the car, turn off the lights, and take off her clothes. She said that she removed her clothes, and that the defendant, who was adjusting his pants, grabbed her, turned her toward him, and penetrated her vagina with his penis while holding her there. She said that she did not remember where the gun was at this point. She said that the defendant ordered her to move to the backseat and to finish removing her clothes. She said that she was crying and shaking. She said that the defendant climbed into the backseat, forced her to lie down on the seat, penetrated her vagina with his penis, and ejaculated. She said that the defendant then turned her over and penetrated her anally with his penis. She said that she was screaming because of the pain and that the defendant stopped when she continued to scream. She said that she did not see the gun while he was raping her in the backseat.

The victim testified that the defendant told her to dress and to return to the front seat. She said that he climbed into the front, pulled the gun from his pocket, and ordered her to drive. She said

the defendant directed her through a series of turns while he looked through her wallet, which contained only her driver's license and student identification. She said the defendant told her to stop in a church parking lot and asked her if she was going to tell anyone what happened. She said that she told him "no." She said he walked behind the car, but she did not see exactly where he went. She said she then realized that she was behind the Exxon Station, and she drove back to Mr. Payton's apartment. She said that the entire incident lasted twenty minutes.

The victim testified that she was screaming as she banged on Mr. Payton's door. She said that Mr. Payton called 911, and she was taken to the hospital in an ambulance. She said that while at the hospital, she answered questions about the incident but that she was in shock. She said that the hospital staff examined her and administered a rape kit. She said that on the day following the incident, she helped construct a composite drawing of her attacker at the Knoxville Police Department (KPD). She described her assailant as wearing a blue uniform of the type worn by someone who works in a garage and a jacket with large pockets. She said that he did not wear gloves and that he touched the inside of her car in several places. She said that he wielded a small gun and explained that by small she meant not a shotgun. She said that Deb Perry of the UT Police Department accompanied her to the KPD, and then they retraced the route the defendant forced her to drive. The victim said that after Christmas break, she met with KPD Detective Tom Pressley and viewed photographs on a computer. She said that she picked out the defendant on the eighth screen. She stated that she had no doubt that he was the person who raped her.

Mr. Philip Payton testified as follows: In November 1996, he was a doctoral student at UT and worked in the Admissions Office. He was friends with the victim, whom he knew from work, and he and the victim had dinner together on November 8th. Neither he nor the victim had any alcohol with dinner. They returned to his apartment around midnight. One of the victim's sorority sisters was visiting one of his fraternity brothers near his apartment. The victim planned to pick up her sorority sister later that evening, and he offered to let her stay at his apartment until then. The victim fell asleep on his couch, and he went to sleep in his bedroom. Mr. Payton did not recall seeing the victim leave the next morning. He next saw the victim when she was banging on his door and screaming to come inside. The victim was leaning on the door and fell into his apartment when he opened it. The victim was very emotional, and her hair was rumpled. The victim kept repeating that she had just been raped. The victim briefly described her attacker to him, and he called 911.

Jack Price, a Report Specialist at Knox County's 911 Center, played the recording of a 911 call received at 6:18 a.m. on November 9, 1996. On the recording, a male stated that his friend had just been raped and was hysterical. After consulting with the victim, who was sobbing in the background, the male reported that the assailant had a gun, he forced the victim into her car, and they drove from the Exxon Station to another location. He stated that the victim described her attacker as a five foot two or three inch, dark-complected African-American with "fading" hair, wearing a blue shirt and black jeans.

William Luke Lee, an emergency doctor at Fort Sanders Regional Hospital, testified as follows: He examined the victim, who said that she had been raped. He took the victim's history

for the purpose of medical diagnosis and treatment. The victim told him that she was at a gas station when a short, African-American man with a gun approached, asked for all of her money, and ordered her into the car. She said they drove to a gravel road where the man forced her to have vaginal and anal intercourse at approximately 5:50 a.m. The victim reported that her attacker ejaculated in the vaginal area, and she denied any bodily injuries. Dr. Lee examined the victim and collected vaginal swabs for the rape kit. He found no semen on a slide prepared from the vaginal swab, but he did not use a dye. He did not notice any bruising or trauma on the victim's body, but he did find blood around the rectal area. In his medical opinion, the blood was consistent with the victim's report that she had been raped.

Larry Janeway testified as follows: In November 1996, he was a criminalist in charge of collecting and preserving evidence for the KPD. On the morning of November 9, 1996, he tested the victim's vehicle for fingerprints. He collected some partial latent prints from the rear window, but the computer located no matches for these fingerprints. He explained that the inside of the car was textured, simulated leather and that it was impossible to get a readable fingerprint from this surface with his equipment. He found a denim jacket and a pair of panties inside the car, and he retrieved the rape kit and the victim's jeans, t-shirt, bra, scarf, and socks from the hospital. That afternoon, he and the victim developed a sketch of the attacker. She described her assailant as an African-American male, twenty-five to thirty-five years old, approximately five feet three inches tall, slender, and partially balding with a receding hairline.

Deborah Perry testified as follows: On November 10, 1996, she was a detective with the UT Police Department. She accompanied the victim to the KPD, and then they retraced the route that the defendant forced the victim to take on the morning of the offenses. They found the alley where the rape occurred, and the victim recognized a nearby storage building. They left the alley and turned left onto Spruce then left onto Fifth Avenue. The victim showed her the parking lot where the defendant left the car. She could not find a street number for the parking lot, and she noted that the two houses across the street were numbers 2437 and 2439.

Dwight Loop, an investigator with the KPD, testified as follows: He was assigned to this case and spoke with the victim at the hospital. The victim appeared to have been crying and was in shock. She described her attacker as an African-American male in his mid-thirties to early forties, five feet and three or four inches tall, and weighing one hundred fifty pounds. She said that he wore a thick blue cotton shirt and black jeans with white lettering on the leg. She said that he was armed with a small, black handgun. Investigator Loop spoke with the victim again on November 10th and she gave a consistent description of her attacker. The victim identified her attacker on January 29, 1997. Investigator Loop spoke with the defendant on February 8, 1997, at the Knox County Penal Farm. The defendant was at the penal farm because he had violated his parole. The defendant waived his rights, signed a waiver form, and gave a statement, which was recorded.

Investigator Loop played the audiotape of the defendant's statement for the jury. In the statement, the defendant said that in November 1996, he lived at 2437 East Fifth Avenue and worked at Marshall's Transmission. He had no idea where he was on the morning of November 9, 1996, and

knew nothing of an alleged abduction and rape of a girl pumping gasoline. Upon learning that the victim had identified him from photographs, he denied knowing anything about the crimes. He admitted that his house was three blocks from the Exxon Station and that he routinely went there after work to buy beer. He said that the Exxon employees knew him and that he did not go there between 4:00 and 5:00 a.m. because he knew that the Exxon Station was closed at that time. He stated that he had never picked up a girl at the Exxon Station and that he did not pick up girls. He said that he had a girlfriend of two years whom he saw almost daily. He stated that he previously owned a .38 caliber gun, but he sold it three months earlier for twenty-five dollars because his girlfriend disapproved of it. He stated that the victim had the wrong man and that people frequently told him that he looked like someone named Michael. He said that he would be willing to give a blood sample and take a polygraph test after he spoke with his attorney. When asked if he had ever had consensual intercourse with someone he met at the Exxon station or from that area, he admitted that he occasionally had sex with prostitutes in the area near Magnolia Avenue. He denied ever being with a girl in a maroon Saturn. Investigator Loop testified that he did not know what type of gun the defendant was talking about but that a snub-nosed .38 is small and can be easily concealed in a coat pocket.

Kathy Lyle, a nurse at the jail, testified that on September 10, 1997, she drew two vials of blood from the defendant. Kelly Smith, a forensic scientist and DNA analyst with the Tennessee Bureau of Investigation (TBI), testified that she found semen present in the vaginal swabs from the victim. She stated that the DNA from the swabs was consistent with the defendant's DNA, taken from his blood sample. She said that the chances of a random match were one in fifty-three thousand in the African-American population. TBI Agent Joe Minor, a forensic scientist, testified that using a different testing procedure, he concluded that DNA from the swabs matched four of five locations on the defendant's DNA. He stated that a match on that many locations occurred in one out of one billion in the African-American population. He said that the African-American population of the United States was thirty-four million.

The defendant testified that although he was not sure of the date, he and the victim had consensual intercourse in his apartment. He said that he was living at 2437 Fifth Avenue in a house converted into apartments. He said that he was paid on Fridays and that on his way home from work, he would buy beer at the Exxon Station and rent a couple of videos at Food City. The defendant said that once he was home, he would watch a movie or two and get ready for that night. On the evening he met the victim, he went to the Club Royale, which closed at 2:30 a.m., and then he went to Chickies, an after-hours club. He said that he parked at Chickies before it became crowded and people began driving by to see who was there.

The defendant testified that he was intoxicated that evening and that he saw a young lady drive by in a red car. He said that he was sitting on his car when she drove through the circle again. He said that she rolled down her window, asked if this was a club, and said that she was just out to have fun. The defendant said that he told her that they could have some fun together, told her his name, and showed her his driver's license. The defendant invited the victim to his apartment, and she followed him there in her car. The defendant denied ever being in the victim's car that evening.

The defendant said that while at his apartment, he and the victim had consensual, unprotected, vaginal intercourse. He said that the victim became upset because he had ejaculated inside her despite her telling him not to do that. He said that he was with the victim for about two hours and that although she was upset, the victim was not outraged when she left his apartment around 2:00 or 3:00 a.m. He said that he never mistook the victim for a prostitute and that he had never seen her before that evening. He said that he previously owned a .30 blue steel gun which held five bullets but that he never held it on the victim.

The defendant admitted that he was convicted of attempted strong-armed robbery in 1980 when he was sixteen years old and of selling crack cocaine in 1992. He admitted that he had misdemeanor convictions for shoplifting, malicious mischief, and larceny. He said that he was on parole for the cocaine conviction at the time that the present offenses allegedly occurred. He stated that he began selling cocaine to pay for his apartment and car when paroled on April 26, 1996. He said that he started using cocaine sometime thereafter and that he eventually called his probation officer and told her that he had a cocaine problem.

The defendant testified that he was in the Knox County Penal Farm as a result of his parole violation when the police initially interviewed him on the present allegations. He said that he had forgotten the victim's name and that he did not think that the officers were talking about his encounter with the victim. He said that the victim was lying when she accused him of kidnapping and rape. He agreed that no reason existed for the victim to wait until she picked out his photograph two or three months after the incident to accuse him of wrongdoing because she knew his name and address. He admitted that he did not tell anyone about his sexual encounter with the victim until after the DNA test results.

Tammy Judd, a parole officer, testified as follows: She supervised the defendant from August 13, 1996, until February 1997 when he violated parole. The defendant left her a message that he was using drugs again. She requested an emergency warrant for the defendant, but he came to her office before the warrant was executed. The defendant tested positive for drugs. The defendant did not tell her that he had been carrying a weapon, which would violate the conditions of his parole, as well as state and federal law.

Based upon this evidence, the jury found the defendant guilty of aggravated kidnapping to facilitate a felony and two counts of aggravated rape.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to convict him of aggravated kidnapping to facilitate a felony and aggravated rape. He argues that no reasonable trier of fact could have found him guilty beyond a reasonable doubt due to the flaws in the state's case. He also claims that the trial court erred in not granting his motion for a judgment of acquittal due to the insufficiency of the evidence. The state contends that the evidence was sufficient to send the case to the jury and to support the resulting convictions.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978).

One commits an aggravated kidnapping by falsely imprisoning another in order to facilitate the commission of a felony or subsequent flight. Tenn. Code Ann. § 39-13-304(a)(1). False imprisonment is the unlawful and knowing removal or confinement of another "so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302. As charged in the presentment, aggravated rape is the "unlawful sexual penetration of a victim by the defendant" when the defendant accomplishes the act by force or coercion and is armed with a weapon. Tenn. Code Ann. § 39-13-502.

The defendant contends that the state's evidence is flawed to the point that a reasonable jury should have experienced reasonable doubt about his guilt. He argues that the jury should have disregarded the victim's account of the events on the morning of November 9, 1996, because her testimony that she spoke with Mr. Payton before leaving to get gasoline that morning conflicts with Mr. Payton's testimony that he last saw her before going to sleep the previous night. The defendant emphasizes that despite the victim's testimony that the defendant violently penetrated her three separate times in her car, the police found no physical evidence of a rape or of the defendant's presence in the car. Finally, the defendant argues that the jury should have found it incredible that a rapist would have asked the victim to drive him to his home following the offenses. The defendant's contentions go to the weight and credibility of the evidence, matters reserved for the jury rather than this court. <u>State v. Pappas</u>, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

Viewing the evidence in the light most favorable to the state, the victim testified that she was pumping gasoline on the morning in question when the defendant, brandishing a gun, forced her to drive him to an alley. She stated that the defendant ordered her to disrobe at gunpoint, then held her down and raped her vaginally and anally. She testified that the defendant forced her to drive him to a parking lot at gunpoint. She said that she did not see where he went after he walked behind her car. Philip Payton testified that the victim returned to his apartment, screaming that she had been raped. The victim's emotional anguish can be heard in the background on the audiotape of Mr. Payton's 911 call. Dr. William Luke Lee, who examined the victim on the morning of the offenses, testified that he found blood in the victim's rectal area, which was consistent with her claim that she was raped. Finally, the DNA from the semen collected in the vaginal swab from the victim matched the defendant's DNA. The evidence is sufficient to support the defendant's convictions for aggravated kidnapping to facilitate a felony and aggravated rape. Furthermore, all of the above mentioned evidence was presented in the state's case-in-chief. Thus, the trial court properly denied the defendant's motion for a judgment of acquittal and sent the case to the jury.

## II.  SUBSTITUTION OF COUNSEL

The defendant contends that the trial court erred in failing to continue his case at the beginning of trial to allow him to change attorneys.  He argues that the loud exchange between him and his attorney gave the court ample reason to suspect that a problem existed regarding the attorney's readiness to proceed.  He maintains that the trial court abused its discretion in allowing him to make only a brief statement regarding his concerns about his attorney and then proceeding with the trial without attempting to learn the reasons for his concerns.  The state contends that the trial court did not abuse its discretion in denying a continuance and the defendant's request for new counsel.  It argues that the defense attorney's opening statement, which laid out the defense theory of consent, gave the court an opportunity to see that the attorney was prepared.

At the hearing on the motion for a new trial, the defendant testified that he was upset at trial because he had not met with his attorney from the time of his initial appointment until two days before trial and that he wanted to change attorneys.  He said that he wanted to tell this to the judge before they started picking the jury but that he could not get his attorney's attention from across the room.  He said that he told his attorney that he did not think the attorney was ready for trial before they selected a jury.  He said he thought that his attorney intended to delay the trial, although his attorney never actually told him that he would.  He stated that he did not tell the judge that his attorney was not prepared until after they selected the jury.  On cross-examination, the defendant agreed that on the morning of trial, he became so angry that he began screaming in the holding cell and could be heard over the entire area.

The record reflects that following the opening statements and with the jury out, the following exchange took place:

Defense Attorney: Your Honor, during the luncheon recess Mr. Hall has asked me to do two things.  He is–in fact, from talking to him, I think he would rather address the Court as to these issues than to have me to do so.  But one thing he wants to do is relieved [sic] me as his attorney.  And, frankly, I think the Court probably would be better off hearing from him as to that issue.

Court: All right.  Let's hear it, Mr. Hall.

. . . .

Defendant: Yes, sir, your Honor.  The day that you appointed me to him, the day that he came to me, I know he had time to come see me, but he failed . . . to come and see me.  I've been up there all this time.  He just now came to see me Sunday, and I tried to get him to . . . let me tell you that, that he failed . . . to do that.  So that's why I want him dismissed off my case.

Court: It's too late for that. You're in jeopardy. Now, what else did you want to ask me?

Defendant: I was telling him that we didn't have enough time to even talk about the case. He just–he just showed up Sunday.

Court: Just have a seat. We're going forward.

Initially, we note that although both parties have addressed this issue in terms of the trial court denying the defendant's request for a continuance, the record does not reflect that the defendant specifically asked for a continuance. The defendant requested that the trial court dismiss his attorney because the defendant did not believe that his attorney had met with him enough to discuss his case. The trial court may, upon good cause shown, permit the withdrawal of an attorney appointed to represent an indigent defendant. Tenn. Code Ann. § 40-14-205(a). A defendant seeking to substitute counsel

> has the burden of establishing to the satisfaction of the trial judge that (a) the representation being furnished by counsel is ineffective, inadequate, and falls below the range of competency expected of defense counsel in criminal prosecutions, (b) the accused and appointed counsel have become embroiled in an irreconcilable conflict, or (c) there has been a complete breakdown in communication between them.

State v. Gilmore, 823 S.W.2d 566, 568 (Tenn. Crim. App. 1991) (footnotes omitted). The trial court has wide discretion in matters regarding the appointment and relief of counsel, and its decision will not be set aside on appeal unless the defendant shows an abuse of discretion. State v. Rubio, 746 S.W.2d 732, 737 (Tenn. Crim. App. 1987). The issue of whether a defendant is entitled to substitute counsel comes within this discretion. Gilmore, 823 S.W.2d at 569.

In determining whether a defendant is entitled to substitute counsel, the trial court must afford the defendant an opportunity to explain his or her dissatisfaction with the present attorney. State v. Ray, 880 S.W.2d 700, 703 (Tenn. Crim. App. 1993). "A trial court must 'take particular pains in discharging its responsibility to conduct these inquiries concerning substitution of counsel. Perfunctory questioning is not sufficient. This is true even when the trial judge strongly suspects that the defendant's requests are disingenuous . . . .'" Id. (quoting United States v. Welty, 674 F.2d 185, 187 (3d Cir. 1982)). In Ray, the defendant sought substitute counsel alleging that the public defender made derogatory racial comments in a letter to the defendant. Without allowing the defendant to present the letter as evidence, the trial court denied the defendant's request, stating that the legislature had required that it appoint the Public Defender's Office to indigent defendants absent a showing of good cause. This court held that the trial court erred in not allowing the defendant to prove his allegations and that its failure to allow the defendant to explain his dissatisfaction made it harder to determine if good cause existed. Ray, 880 S.W.2d at 704. Nevertheless, the court held that the defendant was not prejudiced by the denial of his motion to substitute counsel because the

record revealed that he received effective representation and did not indicate that the public defender was racially biased against the defendant. Id.

In the present case, the trial court did not explore the defendant's reasons for seeking to have his attorney relieved to determine whether good cause existed. Although the defendant bore the burden of showing that his attorney was unprepared, the trial court essentially cut short his explanation because jeopardy had attached in the case. We do not believe that the attachment of jeopardy alone would bar the substitution of counsel, and the trial court erred in basing its denial of the petitioner's request on the mere fact that jeopardy had attached. On the other hand, as will be more fully discussed with regard to the defendant's claim of ineffective assistance of counsel, the defendant has failed to show a reasonable probability that the outcome of the trial was unreliable or that the outcome would have changed with adequate counsel. Thus, the defendant was not prejudiced by the trial court's decision not to relieve his trial attorney and is not entitled to relief on this issue.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

The defendant contends that he received the ineffective assistance of counsel at trial because his attorney failed to investigate and locate potential defense witnesses; to interview the state's witnesses; to investigate the scene of the alleged offenses; to investigate the victim's prior sexual activity or request a Rule 412, Tenn. R. Evid., hearing; to confer with him adequately; and to discuss the trial strategy with him. He argues that as a result of these deficiencies, his attorney's representation fell below that recommended in the guidelines set forth in the American Bar Association Standards for the Defense Function. The state contends that the defendant has failed to show that he was prejudiced by his attorney's representation.

When a claim of ineffective assistance of counsel is made under the Sixth Amendment, the burden is upon the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). The Strickland standard has been applied to the right to counsel under Article I, Section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). When a petitioner claims that ineffective assistance of counsel resulted in a guilty plea, the petitioner must prove that counsel performed deficiently and that but for counsel's errors, the petitioner would not have pled guilty and would have insisted upon going to trial. Hill v. Lockhart, 464 U.S. 52, 59, 106 S. Ct. 366, 370 (1985).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court ruled that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. The court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974) and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in

reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

The petitioner has the burden in the trial court to prove by clear and convincing evidence the factual allegations that would entitle him to relief. Tenn. Code Ann. § 40-30-210(f). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. See Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). In this respect, the petitioner, as the appellant, has the burden of illustrating how the evidence preponderates against the judgment entered. Id. However, we are bound to review the trial court's conclusion regarding the effectiveness of counsel de novo because it involves a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

In the present case, the trial court permitted the defendant's trial attorney to withdraw before the sentencing hearing. In his motion for a new trial, the defendant alleged that he had received the ineffective assistance of counsel from his trial attorney. At the hearing on the motion for a new trial, the defendant testified that on the day his trial attorney was appointed, they conferred for three to five minutes about the possibility of bail. He said that the attorney asked him about the race of the victim and said he would look into the allegations. He said that he next met with his attorney two days before trial, at which time, he first told his attorney that he had consensual sex with the victim. He said that he called his attorney several times in the interim and that although the attorney repeatedly said that he would meet with the defendant in two weeks, he never came. The defendant said that they did not discuss the details of his defense in these telephone conversations.

The defendant testified that he first told his attorney what happened with the victim when they met just before trial. The defendant recounted the version of events that he told his attorney, and his testimony was substantially the same as the account that he had given at trial. He said that his attorney never discussed any investigation with him but that he did know the area where the offenses allegedly started. He said that his attorney should have met with him to discuss tactics and to give his opinion on the case. The defendant said that he was upset at trial because he had not seen his attorney. He said he thought that his attorney intended to delay the trial, although his attorney never actually told him that he would. He said that he told his attorney that he did not think the attorney was ready for trial before they selected a jury but that he did not tell the judge that his attorney was not prepared until after they selected the jury. He said that he never discussed his rights regarding his decision to testify with his attorney. He said that at a break in the trial, he told his attorney that he was going to testify and that he had no choice. He said that if he got a new trial, he would get a complete investigation of his case and a discovery motion to learn how to handle the defense and who was going to be a witness at trial.

The defendant's trial attorney testified that he had been practicing law for fifteen or sixteen years when he tried this case. He said that the defendant's trial was one of his first jury trials following a six-year break to serve as a Judicial Commissioner and to recover from surgery. He said

that he met with the defendant for at least one hour on May 18, 1998, the day he was appointed to represent the defendant. He said that on or around May 18th, he discussed the defendant's potential defenses with the public defender, who had represented the defendant up to that point, and learned that the defendant claimed that he had consensual sex with the victim. He said that the defendant had initially claimed mistaken identity, but after a saliva test revealed that the defendant's sperm would match that in the rape kit specimens, the defendant changed his defense to consent. He said that this change occurred before he came on the case. He said that after reviewing the public defender's file on the case, he had telephone conferences with the defendant on May 28, 1998; July 14, 1998; and July 29, 1998. He said that he next met with the defendant in person in September 1998.

The attorney testified that he did not talk to the state's witnesses before trial. He said that he did not feel that it was important to talk to them because the defense was consent and the only witnesses with information regarding consent were the defendant and the victim. He said that although he did not know whether it would have affected the trial, he wished that he had spoken with the officers involved in the case because he was interested in the time lapse between the offenses and the time the defendant was contacted about the crimes. He said that because the defendant was on parole at the time of the offenses, the police could have easily located him. He agreed that although he received the UT police officer's report sometime pretrial and knew that the victim claimed that the defendant got out of her car across from his own front door, it would have been helpful to talk to the UT Officer. He said that he did not remember whether he argued this point to the jury. He said that he did not think visiting the location of the crimes would have been beneficial because he was familiar with the area, traveled through it frequently, and knew the landmarks discussed in the trial. He said that he should have spoken with someone from the Exxon Station and investigated the identity of the cashier working on the morning of the offenses. He said that he would check the Exxon Station's security tape if he had it to do over again but that the police investigation revealed that the security camera was not working at the time of the offenses.

The attorney testified that he and the defendant discussed the fact that he would make the decisions regarding general trial tactics and that the defendant would make the decisions regarding pleas and whether to testify in his own defense. He recalled telling the jury in his opening statement that he would decide whether the defendant would testify. He explained that because the defendant had to make this decision during the trial, he wanted to deflect any adverse implications the jury might make to him rather than the defendant. He said that the victim was a very credible witness and that the defendant's prior statement was damaging to his claim of consent. He said that the thing he regretted most was not talking to the defendant earlier. He said that if he could have retried the case, he would have persuaded the defendant not to testify and simply had the parole officer show that the defendant's demeanor had not changed during the relevant time period. Ultimately, he agreed that the only way to present a defense of consent was through the defendant's testimony.

The trial court denied the motion for a new trial, finding that the defendant had shown neither deficiency nor prejudice. The court noted that representation could be effective and still

unsuccessful and that the number of times an attorney visits his client does not indicate the quality of the representation.

The approach to the issue of the ineffective assistance of counsel does not have to start with an analysis of an attorney's conduct. If prejudice is not shown, we need not seek to determine the validity of the allegations about deficient performance. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069. In order to establish prejudice, the defendant must show that a reasonable probability exists that "'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Burns, 6 S.W.3d at 463 (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068) (citations omitted). Although the failure to investigate reasonably constitutes deficient performance, the defendant must still prove that he or she was prejudiced by this deficiency. Burns, 6 S.W.3d at 462-63.

The state contends that the defendant has failed to show prejudice, specifically arguing that he has not identified any defense witnesses that his attorney failed to locate, any beneficial evidence from the scene, any prior sexual conduct of the victim that would have aided his defense, or anything that his attorney could have done to present his defense of consent more effectively. The defendant contends that his attorney's deficiencies call the verdict into question. With regard to his claim that his attorney failed to investigate his case, the defendant has not presented a single piece of evidence or a single witness that his attorney should have discovered that would have aided in his defense. Furthermore, although he claims that his attorney did not confer with him adequately and did not discuss the defense strategy with him, the record reveals that the trial attorney presented the defendant's theory of consent and that both the attorney and the defendant believed this to be the only available defense in light of DNA evidence linking the defendant to the victim. The defendant has failed to present any information that he was not able to relate to his attorney that would call the outcome of the trial into question. Because the defendant has failed to show prejudice, we hold that he did not receive the ineffective assistance of counsel.

In light of the foregoing and the record as a whole, we affirm the trial court's judgments of conviction.

_____
JOSEPH M. TIPTON, JUDGE